UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

SCOTT W.  GRAMMER,                    )
                                     )
        Petitioner                    )
                                     )
v.                                   )          NO. 1:11-CV-353
                                     )          *Judge Curtis L.  Collier*
JOSEPH EASTERLING, Warden,            )
                                     )
        Respondent                    )


## MEMORANDUM OPINION


This is a *pro se* petition for a federal writ of habeas corpus, 28 U.S.C.§ 2254, filed by Scott

W. Grammer ("Grammer" or "Petitioner"), an inmate at the Hardeman County Correctional Facility

in Whiteville, Tennessee (Court. File No. 1).  Petitioner challenges the constitutionality of his

confinement pursuant to a 2005 conviction in the Criminal Court for Hamilton County, Tennessee,

where, after a jury trial, he was convicted of three counts of aggravated sexual battery and was given

a total sentence of imprisonment of 22 years.  Warden Joseph Easterling has filed an answer, which

is supported by copies of the state court record, and Grammer has filed a reply to the Warden's

response, (Court File Nos. 5-7, Addenda 1-4; Court File No. 8).  Thus, the case is ripe for disposition.


I.      **PROCEDURAL HISTORY**

        Grammer's convictions were affirmed on direct appeal by the Tennessee Court of Criminal

Appeals and the Tennessee Supreme Court declined any further review.  *State v. Grammer*, No.

E2005-02604-CCA-R3-CD, 2007 WL 595908 (Tenn. Crim. App.  Feb.  26, 2007), *perm. app. den*.

(Tenn. 2007).  After Grammer's subsequent application for post-conviction relief was denied by the

state courts, *Grammer v. State*, No. E2010-00073-CCA-R3-PC, 2011 WL 2184960 (Tenn. Crim. App. June 6, 2011), *perm. app. den.* (Tenn. 2011), he filed this instant habeas corpus petition.

## II.    FACTUAL BACKGROUND

The factual recitation of the evidence offered against petitioner is from the Tennessee Supreme Court's opinion on direct review of his convictions. (The minor victim is referred to by her initials.)

Mark Haley of the Chattanooga Police Department testified that on December 1, 2003, he was called to an apartment in Chattanooga in response to a sex crime, and he interviewed the [Petitioner], the victim, and the victim's mother. Based on the information he received, he contacted the Detectives Bureau.

Eva Grammer testified that she is A.G.'s mother, and A.G. is her daughter from a previous marriage. In 1995, when A.G. was five years old, Grammer married the [Petitioner]. She and the [Petitioner] almost ended their relationship in 1993 because the [Petitioner] had told her that he had "a problem with attraction to young girls and he was afraid that he may possibly act that attraction out with [A.G .]...." Grammer stated that the [Petitioner] used to give A.G. extended massages, and "[t]here were times when [Petitioner] appeared like he didn't want to stop touching [A.G.'s] skin."

Grammer testified that in November of 2003, A.G. became depressed and had begun cutting herself with knives. A.G. was hospitalized for depression in late November and released on December 1, 2003. During A.G.'s first night out of the hospital, Grammer attended a meeting and was away from the home until around 11:00 p.m. When she returned home, the [Petitioner] informed her that A.G. was agitated and needed attention. When Grammer spoke with A.G., A.G. stated that she wanted to cut herself and that she did not think she could keep herself safe overnight. Grammer testified that she contacted A.G.'s caseworker at the hospital to inquire about checking A.G. back into the hospital. The caseworker indicated that A.G.'s behavior was not atypical because many young people develop close friendships while hospitalized and will "act up" in order to be readmitted. When Grammer finished the phone conversation with the caseworker, A.G. told Grammer that she wanted Grammer to read some of the poetry A.G. had written while in the hospital. The poem read, in part, "... you have shown me things/ A child shouldn't see/ Things a child shouldn't know/ Things that make me feel disgusting/ And I want to die!" Grammer asked A.G. if someone had touched her inappropriately, and A.G. indicated that the [Petitioner] had. Grammer testified that she then confronted the [Petitioner], that the [Petitioner] appeared to go into shock, simply repeating "no, no, no" to all of Grammer's inquires on the subject.

Grammer stated that she called 911, but the [Petitioner] took the phone from her hand and hung it up. Grammer and the [Petitioner] discussed the situation, and she told the [Petitioner] that she was taking A.G. and leaving. According to Grammer, the [Petitioner] asked her not to leave, and she replied that if she were going to stay, the [Petitioner] would have to tell her the truth. The [Petitioner] took several deep breaths and stated: "I've touched [A.G.] inappropriately." Grammer recalled yelling at the [Petitioner] and crying, and the [Petitioner] was also crying and apologizing profusely. Shortly thereafter, two police officers arrived and separated Grammer and the victim from the [Petitioner]. Grammer visited the [Petitioner] while he was incarcerated, and she indicated that during each visit he expressed remorse for what had happened. Grammer testified that the [Petitioner] had walked around their apartment nude in front of A.G., and, at one point, she found pornographic pictures of children on the Defendant's computer.

A.G. testified that, at the time of the trial, she was fourteen years old, and she considered the [Petitioner] to be her father. A.G. said that the [Petitioner] normally wore boxer shorts or would be naked while they were at home, and the [Petitioner] often lay in bed with her completely naked, which made her uncomfortable. A.G. stated that the [Petitioner] began sexually abusing her when she was nine years old, and the first sexual abuse occurred in March or April of 2000, while her mother was away at a weekly social group. A.G. was at home with the [Petitioner] watching the film Pleasantville, and there was a scene involving female masturbation. A.G. indicated that, at the time, she did not know that the character in the film was masturbating and she had at that time never engaged in masturbation. During this scene, the [Petitioner] "French kiss [ed]" her. She said that the [Petitioner] then had her take off her clothes, touched her breasts and vagina, and performed oral sex on her. A.G. testified that the [Petitioner] "masturbated" her by touching her on the outside of her vagina and by sticking his finger inside of her. He then made her lay down on her back and inserted his tongue into her vagina. A.G. testified that she thought that what the [Petitioner] was doing was appropriate because she loved the [Petitioner]. At one point, A.G. asked the [Petitioner] if there was anything wrong with it, and he responded that "not everyone thinks this is right." A.G. said she then asked him, "Does [m]ommy think this is al[ ]right?" He responded, "No, so you shouldn't tell her." A.G. testified she did not ask the [Petitioner] any further questions because she trusted him.

A.G. estimated that similar incidents started taking place about once a week and that the incidents usually took place while her mother was away with her social group. A.G. agreed that sometimes the abuse would take place while her mother was asleep and A.G. was in bed with her mother and the [Petitioner]. She testified that once, in June or July, on a Sunday afternoon, she was taking a nap on the bed that her mother and the [Petitioner] shared and, when her mother fell asleep, the [Petitioner] kissed her and touched her breasts and vagina.

A.G. testified that another time, also in the summer and during the day, the

3

[Petitioner] came into A.G.'s room while A.G.'s mother was asleep. A.G. was having trouble with a video game called "Pets," and the [Petitioner] determined that a piece of software needed to be downloaded to fix the game. While the software was downloading, the [Petitioner] kissed A.G. and had her take off her clothes.

A.G. stated that an additional episode of abuse occurred one night in the living room. A.G. was uncertain where her mother was, but she believed her mother was at the store. A.G. said that she and the [Petitioner] had just returned to the house, and the [Petitioner] proceeded to remove all of his clothing, "French kiss" her, and touch her breasts. This incident was interrupted by a neighbor knocking on their door.

A.G. described another encounter in the bedroom shared by her mother and the [Petitioner], where the [Petitioner] asked A.G. to touch his erect penis. She recalled that she was reluctant to do so and that he took her hand and guided it to his penis. She said that she just remained still because she did not know what was expected of her and that eventually the [Petitioner] guided her hand so that she was rubbing his penis up and down. A.G. said that the [Petitioner] then ejaculated and that she got semen on her hand. She described his semen as "clearish white," and she said, "It came out of the top [and] just kind of flowed down it, because he was lying on his back." She said that she was "kind of grossed out," and she scrubbed her hands "like they wouldn't come clean." A.G. estimated that she had masturbated the [Petitioner] around fifteen times and that the [Petitioner] had performed oral sex on her twenty to twenty-five times.

A.G. stated that on several occasions the [Petitioner] had her lie on top of him. She described one such incident in detail saying:

[H]e had me lay on top of him with my hind-end like over his face, and he performed oral sex on me and put his tongue and fingers inside of me and had me masturbate him.... I remember it was daylight, warm outside, because I remember while this was happening, a lot of times I would look out the window, because I didn't want to pay attention to what was happening.

A.G. testified that in November of 2003, after a fight with her mother, she began thinking about the abuse and decided to start cutting herself to feel better. She indicated that some friends at school were very involved in cutting themselves and told her that it would make her feel much better. On November 24, 2003, A.G. was admitted to the hospital for the psychological and emotional problems she was having. On December 1, 2003, she was released, and the following day she disclosed the abuse she had suffered. A.G. also recalled the [Petitioner] acknowledging "I touched her inappropriately" when A.G.'s mother threatened to leave the [Petitioner] if he did not tell her the truth.

A.G. testified that sometimes during the abuse she would ask the [Petitioner] to stop, and he would momentarily stop and then commence what he was doing. She said that

4

the abuse finally ceased when she was around eleven years old. She recalled that the [Petitioner] never inserted his penis into her.

On cross-examination, A.G. agreed that sometimes she cut herself because she was upset about breaking up with a girlfriend. A.G. also acknowledged that during her initial interview regarding the abuse, she may have said that she could not remember anything specific and that her memory of the incidents was "fuzzy." She testified that as time has passed, she has begun to remember things better.

The [Petitioner] testified that he had a good relationship with A.G. However, he felt that the relationship became strained when A.G. began to go through puberty. According to the [Petitioner], A.G.'s behavior further deteriorated through 2003, and A.G. began cutting herself in November of 2003 when A.G. broke up with her girlfriend. The [Petitioner] said that he and his wife responded by taking A.G. to an inpatient facility, but A.G. was allowed to return home after "contracting" that she would not hurt herself. Shortly thereafter, A.G. woke the [Petitioner] and his wife up one night and said that she wanted to cut herself, which they later learned was actually an aborted suicide attempt. A.G. was readmitted into the psychiatric hospital and remained there for several days.

The [Petitioner] testified that, upon A.G.'s return home, A.G. informed her mother that the [Petitioner] had been touching her inappropriately. The [Petitioner] stated that he was first made aware of this accusation while A.G.'s mother was on the phone with what he believed was the psychiatric hospital. He said that he took the phone and hung it up out of "instinct" and that he did not know that A.G.'s mother was actually on the phone with a 911 operator. The [Petitioner] denied ever making the statement "I touched her inappropriately" during the initial confrontation with A.G.'s mother. The [Petitioner] stated that a few minutes later the police arrived, and he was told that he had to leave and to contact Detective Akins in the morning. The [Petitioner] testified that he never expressed any form of sexual attraction to children.

On cross-examination, the [Petitioner] denied walking around the house naked in front of A.G. He stated that Grammer had insisted it was fine for him to be naked in front of A.G. when she was young, but he never felt comfortable being nude in her presence and stopped when A.G. was seven or eight years old. The [Petitioner] indicated that Grammer had testified that the [Petitioner] said "I touched her inappropriately" because Grammer wanted to facilitate a divorce with him. The [Petitioner] stated that he never contacted any girls A.G.'s age on the internet but that he did communicate on the internet with a couple of girls three or four years older than A.G. He was referred to these girls' online diary entries from A.G.'s online diary, and he read them because they were similar in content to A.G.'s and would allow him to better understand how A.G. was thinking.

The [Petitioner] denied ever having pornography on the computer in the home and indicated that he had not fought with Grammer about the issue. The [Petitioner]

testified that A.G. would lie to get out of trouble and that, in spite of the allegations leveled against him, he still loved A.G. He indicated that A.G. had severe problems and that he did not hold her responsible for her words or actions in this case. The [Petitioner] denied sexually abusing A.G., and he stated that he did not deny the allegation to the police when they arrived because he was "mortified" and did not know what to say. The [Petitioner] indicated that he never apologized to Grammer for anything that transpired between the [Petitioner] and A.G. He also did not recall A.G. ever writing poetry.

Grammer v. State, 2007 WL 595908, at *1-*4.

## III.    DISCUSSION

The instant petition for habeas corpus relief was filed timely on November 21, 2011. Petitioner raises three main grounds in his petition: 1) denial of his rights of confrontation and to present a complete defense; 2) denial of his right to a speedy trial; and 3) ineffective assistance of counsel at trial and on appeal. The Warden suggests, in his response, relief should not be granted because certain sub-claims in Ground 3 have been procedurally defaulted and because Grammer is not entitled to relief from the state court decisions rejecting the remaining claims on the merits, given the deferential standards of review set forth in 28 U.S.C. § 2254. The Court agrees with Respondent Warden and, for the reasons which follow, will **DENY** the petition and **DISMISS** this case.

These claims have been organized into two categories for purposes of discussion. The first category encompasses the procedurally defaulted claims and the second those claims which were adjudicated in the state courts.

### A.      Procedurally Defaulted Claims

Petitioner alleges, as sub-claims in Ground 3, his trial attorneys gave him ineffective assistance by suffering from an undisclosed conflict of interest and his appellate counsels by failing to petition for a rehearing and to challenge the sufficiency of the evidence on the third count of the indictment.   In his answer, Respondent argues Grammer has committed a procedural default since

he did not present these instances of ineffective assistance to the Tennessee Court of Criminal Appeals ("TCCA") during the post-conviction review and since he has no avenue left under Tennessee law to present those claims to the state courts. Grammer contests, in his reply, that counsel's first or third alleged errors (i.e., conflict-of-interest and insufficient-evidence claims) have been procedurally defaulted, (Court File No. 8, Pet'r Reply at 5-6).[1]

Under 28 U.S.C. § 2254(b) (1), a state prisoner's petition for a writ of habeas corpus will not be granted unless he has exhausted his available state court remedies. He does so by "fairly presenting" the substance of each of his federal constitutional claims to the state courts for disposition. *See Hannah v. Conley*, 49 F.3d 1193, 1196 (6th Cir. 1995).

A prisoner who has failed to present a federal claim to the state courts and who is now barred by a state procedural rule from returning with his claim to those courts, has committed a procedural default. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Federal review of a procedurally defaulted claim is foreclosed, unless the habeas petitioner can show cause to excuse his failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation. *Id.* Cause can be shown where interference by state officials has rendered compliance with the rule impracticable, where counsel rendered ineffective assistance in violation of the prisoner's right under the Sixth Amendment, or where the legal or factual basis of a claim is not reasonably available at the time of the procedural default. *Murray v. Carrier*, 477 U.S. 478, 488, 492 (1986). A petitioner demonstrates prejudice by establishing the constitutional error "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."

---

[1] Grammer does not take issue, however, with respondent's argument concerning the procedural default of the second purported attorney error involving the motion to rehear.

*United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Petitioner directs the Court to pages 13 and 14 of his post-conviction appellate brief where he maintains he presented his claim of a conflict-of interest and to his citation to the transcript of his testimony at the post-conviction hearing, as support for the issue. However, the Court has reviewed the cited pages of petitioner's brief and has not located any reference to a conflict of interest on the part of his attorneys, (Court File No. 6, Addendum 4, Doc. 1, Pet'r Br. at 13-14). Further, the aforementioned pages are contained within the segment of the brief, which is entitled, "Statement of the Case and Facts," (*Id*. at 5), not under the section labeled, "Argument," wherein the issues to be considered by the TCCA are raised, factually developed, and argued, (*Id*. at 19-63).

Grammer also maintains he raised the third claimed attorney error (failure to present insufficient evidence as an issue on appeal) on pages 59 and 62 of his brief to the TCCA. On page 59, Issue IV reads, in relevant part:

> THE POST-CONVICTION COURT ERRED IN DENYING PETITIONER'S PETITION FOR POST-CONVICTION REVIEW WHERE THERE WAS INSUFFICIENT EVIDENCE TO EVEN CONSTITUTE AGGRAVATED SEXUAL BATTERY REGARDING THE PETZ COMPUTER GAME INCIDENT, THE STATE SPECIFICALLY LIED TO THE JURY IN ARGUMENT ABOUT THE TESTIMONY, TRIAL COUNSEL FAILED TO OBJECT TO THE STATE'S MISREPRESENTATION AS TO THE EVIDENCE AND FAILED TO RAISE SAME ON APPEAL . . . .

(*Id*. at 59).

Underneath this caption, Grammer asks that the issue receive plain error review[2] and then argues the victim did not testify he had fondled her breasts or her vaginal area, as the prosecutor had stated in her closing argument. Next, on page 62 of the brief, petitioner maintains that the "State cannot merely invent the evidence . . . as it did in this case; nor can the jury be allowed to simply

---

[2] Plain error review is reserved for an error not raised in a motion for new trial or on appeal.

assume prejudicial facts not in evidence, based solely on the misrepresentation of the prosecutor,"
(*Id*. at 62). Grammer goes on to argue this: "Moreover, in what can clearly only be considered
ineffective representation, Petitioner's trial counsel failed to object to the State's perjured summation
of testimony and further neglected to even raise this issue," (*id*. at 62).

      The above recitation of the issue and arguments demonstrates the claim centered on the
prosecutor's alleged misstatements and trial counsels' failure to object to those misstatements, not
to any failure on the part of Grammer's appellate attorneys to challenge the sufficiency of the
evidence. Moreover, prosecutorial misconduct is properly raised in a motion for a new trial or on
appeal, whereas ineffective-assistance claims typically are channeled to post-conviction proceedings.
*Compare McCarver v. State*, 2010 WL 596344, *4 (Tenn. Crim. App. Feb. 19, 2010) ("[T]he
Petitioner's prosecutorial misconduct claim has been waived because the Petitioner failed to raise the
claim on direct appeal.") with *State v. Blackmon*, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001)
("[I]neffective assistance of counsel claims should normally be raised by petition for post-conviction
relief") (citation omitted). Thus, it makes no sense to seek plain-error review on a post-conviction
appeal of an ineffective assistance claim because the post-conviction scenario is the designated state
court remedy for such a claim, and not direct review.

      Furthermore, even if the argument in Issue IV was founded on an alleged error on the part of
Grammer's appellate attorneys, the error involved was the failure to object to prosecutorial
misconduct, not to any failure to challenge the sufficiency of the convicting evidence. This is shown
by the wording of the claim itself: "TRIAL COUNSEL FAILED TO OBJECT TO THE STATE'S
MISREPRESENTATION AS TO THE EVIDENCE AND FAILED TO RAISE SAME ON
APPEAL," (Court File No. 6, Addendum 4, Doc. 1, Pet'r Br. at 59). That the attorney error with
which Grammer was charging counsel was the failure first to object to and then to appeal the claimed

instance of prosecutorial misconduct is simply beyond cavil.

Based on the above reasoning, the Court finds these three sub-claims involving ineffective assistance of counsel asserted in Ground 3 to have been procedurally defaulted due to Grammer's failure to present them to the TCCA in his post-conviction appeal. Petitioner can still obtain habeas review of those claims if he can demonstrate cause, such as where an "external impediment" precludes counsel from raising the claim, and also prejudice. *Carrier*, 477 U.S. at 492. Grammer has not shown, or even alleged, cause and prejudice to surmount the default, and he, thereby, has forfeited federal habeas corpus review for these sub-claims.

### B.    Adjudicated Claims

Under the review standards set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA), codified in 28 U.S.C. §§ 2241, *et seq*., a court considering a habeas claim must defer to any decision by a state court concerning the claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d)(1)-(2). A state court's decision is "contrary to" federal law when it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or resolves a case differently on a set of facts which cannot be distinguished materially from those upon which the precedent was decided. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Under the "unreasonable application" prong of § 2254(d)(1), the relevant inquiry is whether the state court decision identifies the legal rule in Supreme Court cases which governs the issue but unreasonably applies the principle to the particular facts of the case. *Id.* at 407. The habeas court is to determine only whether the state court's decision is objectively reasonable, not whether, in the

habeas court's view, it is incorrect or wrong. *Id.* at 411.

This is a high standard to satisfy. *Bowen v. Jones*, 2012 WL 573863, *5 (6th Cir. Feb. 22, 2012) (observing that to prevail on a state-court adjudicated claim, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement") (citing *Harrington v. Richter*, 562 U.S. –, 131 S. Ct. 770, 786-87 (2011)). Further, findings of fact which are sustained by the record are entitled to a presumption of correctness—a presumption which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### 1. Rights to Confront and Present a Defense (Pet., Ground 1)

In his first claim in the adjudicated-claims category, Grammer maintains the trial court's denial of his motion for discovery of the victim's medical records, specifically, her psychological records, prevented his attorneys from presenting a complete defense on his behalf and from subjecting the most important prosecution witness, the victim herself, to a full cross-examination. According to the petition, the trial court, after an *in camera* inspection of the records, determined the records contained no exculpatory evidence and denied the defense access to the records.

Grammer argues the victim had extensive psychological records from stays at various mental institutions and from interviews with psychologists, both before and after the allegations of abuse surfaced. It essentially is petitioner's position that the trial court, uninformed as to the defense theory; unknowledgeable as to what information contained in those records would be potentially relevant to and of probative value to his defense; and untrained in children's psychology, memory, and susceptibility to suggestion, was not as qualified to determine whether the records were relevant or probative as his own attorneys and his expert in child psychology, Mary Lynn Huffman, Ph.D.

11

Petitioner argues, had his defense team been allowed access to those records, they could have verified what was relevant and probative to the defense. Also, the records might have revealed the victim's psychological problems, hospitalizations, and antidepressant medications possibly were occasioned by the rupture in the victim's relationship with a girlfriend, not by the alleged occurrences of sexual abuse from which stemmed petitioner's charges. Too, those records could have helped the defense ascertain whether those mental health therapies had affected her memory.

Respondent argues that the claim was adjudicated in the TCCA and resulted in a ruling which is not contrary to or an unreasonable application of clearly established Supreme Court precedent, nor based on an unreasonable determination of the facts presented to the state courts.

In his brief on direct appeal to the TCCA, Grammer asserted that denying his attorneys' motion for discovery of the victim's medical and psychological records violated Rule 16(D) of the Tennessee Rules of Criminal Procedure and "effected a violation of Grammer's Sixth Amendment right to confrontation, making it impossible for defense counsel to prepare and execute an effective cross-examination of the sole eyewitness to these alleged crimes," (Court File No. 6, Addendum 3, Doc. 1, Pet'r App. Br. at 20). In support of his claim, petitioner argued the trial court's *in camera* inspection of the records was insufficient to determine whether information in the records was relevant and probative because "there may have been an abundance of potentially material and exculpatory clues identifiable only by an expert in the relevant field [of child psychology and memory],"(*Id*. at 22 ). There is no mention of a violation of his right to present a defense and, thus, this argument has been procedurally defaulted and will not be given habeas corpus review.

In addressing the confrontation issue, the TCCA recounted that the trial court, after performing an *in camera* inspection of the records to determine whether they had any probative value in the preparation of petitioner's defense, had concluded they had no such value. *State v. Grammer*,

2007 WL 595908, *8 (Tenn. Crim. App. Feb. 26, 2007), *perm. app. den.* (Tenn. 2007). Observing that the trial court, in its discretion, was the arbiter of whether the contents of the records had probative value, either as direct evidence or as a source of cross-examination, and that "[t]he admissibility, relevancy, and competency of evidence are matters entrusted to the sound discretion of the trial court," the TCCA noted the requested records at issue were not included in the appellate record. " *Grammer*, 2007 WL 595908, at *9. The state appellate court noted the absence of the records generally precluded the issue from consideration and triggered a presumption that the lower court's ruling was supported by the evidence. *Id.*

The TCCA further pointed to Tennessee Code Annotated § 37-1-612, which provided "all records concerning reports of child sexual abuse . . . shall be confidential and exempt from other provisions of law, and shall not be disclosed." *Ibid.* Despite acknowledging the existence of statutory exceptions to the non-disclosure rule, the TCCA noted "that production to individuals accused of child sexual abuse is not among the exceptions." *Ibid.* Finding the statute prohibited the requested discovery of the victim's medical records, the TCCA denied relief.

Whether a violation of a state discovery rule occurred in state court is not a matter of concern to this habeas court. *See Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002) (finding a claim that a prosecutor violated a state discovery rule requiring disclosure of names of anticipated witnesses is not a constitutional violation and, therefore, not cognizable on federal habeas review), *cert. denied*, 538 U.S. 947 (2003). What does concern this Court are constitutional violations, such as the violation of the right to confront, which is encompassed in the Sixth Amendment, as presented in Grammer's appellate brief on direct review. Though the TCCA recognized petitioner was maintaining "his inability to view these records hindered his ability to prepare for trial and to conduct an effective cross-examination of the victim," *State v. Grammer*, 2007 WL 595908, at *8, the state appellate court

13

did not discuss the constitutional aspect of the claim.

Even so, the state court ruled against petitioner with respect to his claim that he was denied the victim's psychological records, finding the records had "no value to the preparation of the defense." The deferential review standards in § 2254(d) do "not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 131 S. Ct. at 785. Thus, because the state court rejected the claim, the Court presumes, absent any rebuttal of the presumption, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, 133 S. Ct. 1088, 1091-92 (2013).

When there is no citation to relevant Supreme Court cases or reasoning underlying the state court decision, as in the case here, the Court performs a modified deferential review. *See Harris v. Stovall*, 212 F.3d 940, 943 n. 1 (6th Cir. 2000). Using a modified deferential review, the state court's ruling is to be examined under the "unreasonable application" prong of § 2254(d), but must not be upset unless an independent review of the record and the relevant principle in Supreme Court cases persuades this Court the ruling contravenes or unreasonably applies the principle or results from an unreasonable factual determination in light of the evidence offered to the state court. *Williams v. Anderson*, 460 F.3d 789 (6th Cir. 2006).

In *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), the relevant Supreme Court case for claims of this genre, *see Renusch v. Berghuis*, 75 Fed. Appx. 415, 423, 2003 WL 22128709, *8 (6th Cir. Sept. 12, 2003) (*Ritchie* is "[t]he seminal Supreme Court case in this area . . . ."), a defendant charged with rape and other sexual offenses against his thirteen-year-old daughter served subpoenas for the state child protective service agency's investigative files, including a medical report, involving the victim's report of sexual abuse. Claiming the files were privileged under state law, the agency refused to comply with the subpoena. The defendant moved for sanctions against the agency for its

14

failure to honor the subpoena, and a hearing was held on the motion. The trial court thereafter denied the motion and refused to order the agency to disclose the files. At trial, defense counsel conducted a lengthy cross-examination of the victim concerning the assaults and her reasons for not reporting the incidents of sexual abuse earlier. Defendant was convicted and appealed to the state courts, successfully claiming the failure to disclose the files violated the Sixth Amendment's Confrontation Clause. Despite the trial judge's examination of the file and subsequent determination that it contained no relevant information, the highest state court concluded that defendant, through his lawyer, was entitled to review the state agency's entire file to search for any useful evidence, since the defendant was denied "the opportunity to have the records reviewed by 'the eyes and the perspective of an advocate' who may see relevance in places that a neutral judge would not." *Id*. at 44.

The issue was raised in the U. S. Supreme Court, which rejected the proposition that the Confrontation Clause, "includes[s] the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony" or "in preparing for trial." *Id*. at 53 and n.9. Typically, where defense counsel is given wide latitude to question trial witnesses, so held the Supreme Court, the Confrontation Clause is satisfied. Observing the defense had been allowed full questioning of the witnesses, the Supreme Court held the highest state court had erred in holding that the failure to disclose the child abuse investigation file violated the defendant's right to confront. Noting a defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance, it went on to hold that due process dictated the file be reviewed only by the trial court *en camera* to determine whether it contained material information—a review, the Supreme Court recognized, which does not allow defense counsel access to the file. *Id*. at 59-61.

Here, the trial judge who presided over Grammer's case conducted an *en camera* review of

15

the victim's records sought by the defense, concluding them to contain no relevant information. The transcript of the trial shows Grammer's lawyers were given wide latitude in cross-examining the victim and other trial witnesses. The TCCA denied relief, and Grammer has not cited to a Supreme Court case to show the state courts' determination of his claim was contrary to or unreasonable application of federal law. Thus, he is not entitled to a writ of habeas corpus on this issue.

### 2. Right to a Speedy Trial (Pet., Ground 2)

Grammer offers the following assertions in support of this speedy-trial claim. Petitioner was arrested and incarcerated on December 19, 2003. He rejected the final plea offer prior to September 13, 2004, which constituted a demand for trial. On February 11, 2005, his attorneys filed a motion for a speedy trial or, in the alternative, a dismissal of the charges. The trial began on May 17, 2005, seventeen months after his arrest. During this entire time, petitioner was detained in the Hamilton County Jail. The State's alleged reason for the delay was the victim's mental health, even though, during those seventeen months when she was supposedly too sick to attend trial, she attended public school and took an SAT test, scoring, at only 13 years of age, 1,040 points—a score higher than that achieved by female Seniors in high school. Finally, at the trial, the victim's stated and only diagnosis was major depression. (The trial occurred a mere 21 days after the date it had been scheduled and after the State, in its motion for instruction, had asserted it could not be ready for, due to the victim's condition.) These facts suggest the prosecution exaggerated the victim's mental condition for the purpose of delaying the trial and pressuring petitioner to plead guilty

When Grammer presented his speedy-trial claim to the TCCA, the state appellate court, citing to *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed.2d 101 (1972), described the factors to be weighed to determine whether a defendant's speedy-trial right has been violated. They included: the length of the delay, the reason for the delay, defendant's assertion of his right, and any

16

prejudice ensuing from the delay. Noting a delay must "approach one year" to trigger an analysis of the remaining factors and finding the delay between Grammer's arrest and trial to be some seventeen months, the TCCA found the delay, implicitly, to be presumptively prejudicial, and went on to weigh the remaining factors.

The TCCA found the prosecution's proffered reason for the delay, i.e., the victim's psychological instability, to be a compelling and valid reason for the delay, considering the severity of her mental problems had warranted inpatient treatment in psychiatric facilities and that she had engaged in self-mutilations and suicide attempts. Next, the TCCA addressed Grammer's contentions concerning the prejudice factor, rejecting his argument that the delay prevented an alibi defense or calling witnesses who may have moved or become available. The rejection was based on petitioner's failure to identify the witnesses or supply the testimony they likely would have given. Likewise rebuffed was Grammer's argument that his ability to communicate with counsel and participate in his defense was lessened, considering his failure to give any concrete examples to illustrate his argument. The only argument with substance involved Grammer's 17-month pretrial incarceration, but this too failed upon the TCCA's determination that the pretrial detention, by itself, could not have so prejudiced him as to have denied him his right to a speedy trial, given the valid reason for the delay. Based on the weighing of the factors, the state appellate court concluded Grammer's right to a speedy trial was not violated and relief was unjustified.

As the TCCA noted, the appropriate analysis for determining whether a defendant's right to a speedy trial has been denied is enunciated in *Barker v. Wingo*, 407 U.S. 514 (1972), which requires the Court to apply a four-factor balancing test, which, in turn, weighs the conduct of both the prosecution and the defendant. *Id.* at 521. Because the state court relied on *Barker* as supplying the governing legal principle to a speedy-trial claim, its decision is not contrary to the well established

17

rule in a Supreme Court case. *Vermont v. Brillon*, 129 S. Ct. 1283 (2009) (applying *Barker* to review of speedy trial claim); *Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005) (same in § 2254 case); *Davis v. Kelly*, 316 F.3d 125, 127 (2d Cir. 2003) ("The determination of whether pre-trial delay violates the Sixth Amendment is governed by *Barker v. Wingo* . . . .").

Here, the TCCA treated the delay of seventeen months as sufficiently prejudicial to invoke a weighing of the remaining *Barker* factors. There is no dispute the victim's psychological status provided the reason for the delay and, though Grammer questioned the precariousness of her mental status, it was evidenced, as the TCCA noted, by her self-mutilation and suicide attempts and was serious enough to call for hospitalization. This factor weighs in favor of the prosecution. *United States v. Robinson* , 455 F.3d 602, 607 (6th Cir. 2006) ("[V]alid reasons for a delay weigh in favor of the government.").

 Petitioner asserted his right to a speedy trial by motion made in February, 2005, when the trial was set for April 26, 2005, (Addendum 1, vol. 1, at 26-27). This factor falls on Grammer's side, if only slightly. *See Cain v. Smith*, 686 F.2d 374, 383–84 (6th Cir. 1982) ("The timeliness, vigor, and frequency with which the right to a speedy trial is asserted are probative indicators of whether a defendant was denied needed access to a speedy trial over his objection."); *but see Wood v. Vasbinder*, 310 Fed.Appx. 861, 865, 2009 WL 383681, * 4 (6th Cir. Feb. 18, 2009) (noting "a single assertion of the right can be enough to make this factor weigh in a petitioner's favor") (citation omitted).

The only factually-supported claim of prejudice asserted by Grammer involved his pretrial incarceration, which the TCCA found insufficient, in and of itself, to have resulted in the kind of prejudice which would overcome the valid reason offered by the prosecution to justify the delay. While an affirmative showing of "particularized prejudice is not essential to every speedy trial

18

claim," *Doggett v. United States*, 505 U.S. 647, 655 (1992), in the absence of a demonstrated harm flowing from the delay, "the reason for the delay (factor 2) [is] used to determine whether [a petitioner] was presumptively prejudiced." *United States v. Schreane*, 331 F.3d 548, 559 (6th Cir. 2003) (quoting *United States v. Mundt*, 29F.3d 233 (6th Cir. 1994)).

Under 28 U.S.C. § 2254(d), '[w]hen assessing whether a state court's application of federal law is unreasonable, the range of reasonable judgment can depend in part on the nature of the relevant rule that the state court must apply." *Renico v. Lett*, 130 S.Ct. 1855, 1864 (2010) (citation and internal quotation marks omitted). The speedy-trial right "is a more vague concept than other procedural rights. It is, for example, impossible to determine with precision when the right has been denied." *Barker*, 407 U.S. at 521. Also "[a] balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right." *Id*. at 530.

In recognition of the "leeway [state] courts have in reaching outcomes in case-by-case determinations," when applying general legal rules, *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004), such as *Barker*'s speedy-trial analysis, this Court finds TCCA's rejection of Grammer's claim was neither an unreasonable application of *Barker* nor based on an unreasonable determination of the facts presented to the state courts. No writ will issue.

### 3. Right to Effective Assistance of Counsel at Trial and on Appeal (Pet., Ground 2)

As a prefatory matter, Grammer originally filed a sixteen page habeas corpus petition, a sixty-eight page supporting memorandum, and over two hundred pages of exhibits, (Court File No. 1, Attachments 1-2). Because the voluminous filing impeded the Court's preliminary review of the

19

pleading, Grammer was ordered to prepare and file a supporting memorandum which complied with twenty-five (25) page limit established in LR 7.1(b). In response, petitioner submitted a twenty-page memorandum, (Court File No. 3). In the section containing his claims of ineffective assistance of counsel (Ground Three), he states: "Due to the space limitations placed on this memorandum by L.R. 7.1(b), the complaints against counsel cannot all be set out in detail here; they are simply too numerous . . . . The Petitioner respectfully directs the Court's attention to his Exhibits 8-10, containing [his post-conviction petitions] or excerpts thereof, filed simultaneous (sic) to this memorandum. The Petitioner adopts the referenced parts of those exhibits, along with his original Exhibits 1-7 . . . . For the purpose of relating the facts and law pertinent to this ground, the Petitioner relies on the facts and law outlined in Exhibit 8, and in the additional facts listed herein," (*Id*. at 12-13).

Exhibit 8 is sixty pages in length. Permitting Grammer to incorporate Exhibit 8, as well as Exhibits 1-7 (which are, respectively, one hundred, fourteen pages and one hundred and seven pages in length) would extend the twenty-page memorandum to three hundred and one pages. Rule 8 of the Federal Rules of Civil Procedure, which applies to habeas corpus petitions, *see* Rule 12 of the Rules Governing Section 2254 Cases, requires a pleading to "contain a short and plain statement of the claim." The Court believes a twenty-five page memorandum would have been of sufficient length to permit Grammer to identify and factually support his claims. Thus, the Court will not consider the original memorandum; will review the claims presented in the memorandum which Grammer has filed to replace it; and will decline petitioner's invitation to construct his claims for him from Exhibit 8 and previous Exhibits 1-7 .

The Sixth Amendment provides, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI.

A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland* 466 U.S. at 687. Petitioner has the burden of showing both deficient performance and prejudice, *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000)—the latter burden being quite a heavy one. *Williams v. Taylor*, 529 U.S. 362, 394 (2000) .

In considering the first prong of the test set forth in *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires the petitioner show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had

21

no effect on the judgment." *Strickland*, 466 U.S. at 691. In order to prevail on a claim of prejudice, a petitioner must show "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. While both prongs must be established in order to meet a petitioner's burden, *Strickland* teaches if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed. *Id.* at 697. Review of a *Strickland* claim under § 2254(d)(1) is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S.Ct. 1411, 1420 (2009). And "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable," but instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S.Ct. at 788.

Here, Grammer alleges he received ineffective assistance from his appointed attorneys, Lead Counsel Larry Young and Co-counsel Susie Lodico. More specifically, petitioner asserts his attorneys failed to object to numerous instances of prosecutorial misconduct, including expressions of opinion regarding the credibility and guilt of the defendant, vouching for witnesses, and subordination of perjury; to cross examine fully the victim; to preserve issues for appeal; and to appeal many issues.

### a. *Prosecutorial Misconduct*

Petitioner claims, without factual elaboration, the prosecutors violated, in some unexplained way, *Berger v. United States*, 55 S. Ct. 6729 (1935), and other Supreme Court, Sixth Circuit, and Tennessee cases; suborned perjury; failed to correct untruthful testimony by State witnesses; and withheld valuable impeachment evidence. He further claims his attorneys gave him ineffective assistance by failing to object to nearly all of this prosecutorial misconduct or to raise it on appeal.

During the post-conviction appeal, the TCCA addressed the claimed prosecutorial misconduct which Grammer's attorneys purportedly had failed to challenge.

22

The petitioner argues that he received the ineffective assistance of counsel because his trial attorneys failed to object to numerous instances of misconduct by one of the prosecutors during her closing argument and while questioning the defense expert. The State contends that the post-conviction court properly found that the petitioner failed to show he was prejudiced by any alleged prosecutorial misconduct. We agree with the State.

Our review of the record shows that many of the petitioner's claims of misconduct have no merit. For example, the petitioner argues that the following statement by the prosecutor was an improper voucher of credibility on the State's witnesses:

> The mother, like her or not, immediately believes her child, so much so that she called 911. Again, man she'd lived with, known since 1980, high school sweethearts, all she'd ever known. Calls 911 right away because she believes her child so much. Consistent with her testimony. Tells Officer Haley the exact same thing. Consistent with her testimony. Talks to Detective Akins four days later. Consistent with her testimony. Exact same, didn't change. Talks to the DA's office. Consistent. Story never changed. Same story.

In our view, the prosecutor's pointing out that E.G.'s story had remained consistent was not a personal voucher for E.G.'s truthfulness.

On the other hand, some of the prosecutor's statements were improper. For example, during her rebuttal closing argument, the prosecutor stated, "Scott purported, in his direct, how much he loves [A.G.].... I'm not certain of that" and "But how would Scott Grammar (sic) benefit by lying, which he so obviously did?" The prosecutor also incorrectly stated that the petitioner admitted to having pornography on his computer. However, the trial court instructed the jury, "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." Generally, we presume that a jury has followed the trial court's instructions. While not condoning certain statements or remarks made by the prosecutor, we agree with the post-conviction court that the petitioner has failed to demonstrate he was prejudiced by them.

*Grammer v. State*, 2011 WL 2184960, *10-11 (Tenn. Crim. App. June 6, 2011), *perm. app. den.* (Tenn. 2011) (all internal citations omitted).

In *Darden v. Wainwright,* 477 U.S. 168 (1986), a prosecutor's improper remarks were held to violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637,

23

643 (1974)). The prosecutor's closing argument, according to the Supreme Court,

> "deserves the condemnation it has received from every court to review it, although no court has held that the argument rendered the trial unfair. Several comments attempted to place some of the blame for the crime on the Division of Corrections, because Darden was on weekend furlough from a prison sentence when the crime occurred. Some comments implied that the death penalty would be the only guarantee against a future similar act. Others incorporated the defense's use of the word 'animal.' Prosecutor McDaniel made several offensive comments reflecting an emotional reaction to the case. These comments undoubtedly were improper. But as both the District Court and the original panel of the Court of Appeals (whose opinion on this issue still stands) recognized, it 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.' The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'"

*Id*., at 179-181. The remedy for conduct so egregious as to deny a petitioner a fundamentally fair trial is a reversal on direct review. *Griffin v. California*, 380 U.S. 609, 615 (1965). But, habeas corpus relief will lie for prosecutorial misconduct only where the error "had substantial an injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

Petitioner argues, in his reply to the Warden's response, the state court's reliance on the presumption a jury has followed its instructions "does not hold water," (Court File No. 8 at 13). He points to his post-conviction petition, where he cited to several Sixth Circuit opinions, which suggest, according to his lights, a routine instruction at the conclusion of the trial is not sufficient to cure a prosecutor's improper comments.

However, a multi-step analysis for evaluation of claims of prosecutorial misconduct was employed in most of the Sixth Circuit opinions cited by Grammer—an analysis which, at that time, was required by circuit precedent. *See e.g., Blackmon v. Booker*, 696 F.3d 536, 557 (6th Cir. 2012).

24

Recently though, the Supreme Court has disapproved of the analysis, observing that the "highly generalized standard for evaluating claims of prosecutorial misconduct set forth in *Darden* bears scant resemblance to the elaborate, multistep test employed by the Sixth Circuit." *Parker v. Matthews*, 132 S.Ct. 2148, 2155 (2012).

Furthermore, in none of those cited cases did the Sixth Circuit apply the deferential review standards for state court decisions, as set forth in 28 U.S.C.§ 2244(d). And the Sixth Circuit has since recognized this "test has no application on collateral review of a state court conviction under § 2254(d)(1)." *Blackmon*, 696 F.3d at 557.

Also, while the cases cited by Grammer advance a rule that, in some cases, instant curative instructions are required for certain instances of prosecutorial misconduct, he has directed this Court to no Supreme Court case which so holds. The Supreme Court teaches "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Knowles*, 556 U.S. at 122 (citations and internal quotation marks omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.") (citation and internal quotation marks omitted).

Given that both the *Darden* and *Strickland* rules are general ones, *Parker*, 132 S. Ct. at 2155; *Knowles*, 556 U.S. at 122, and that the AEDPA "demands that state-court decisions be given the benefit of the doubt," *Renico*, 599 U.S. at, __, 130 S. Ct. at 1862 (citations omitted), the Court finds relief is unwarranted on this claim because the state court rejection of petitioner's ineffective assistance was not an unreasonable application of nor contrary to the pertinent Supreme Court

precedents and because the state court did not unreasonably determine the facts put before it.

### b. *Cross-Examination of the Victim*

Because Grammer offered no factual support for his claim, either in his form petition or in his memorandum, the Court will assume the claim addressed by the TCCA is the one which is being raised here. There, petitioner maintained "that counsel should have cross-examined the victim about an inconsistency in her testimony. Specifically, he contend[ed] that the victim testified at trial that the abuse occurred for two years, but Officer Haley testified in a jury-out hearing that the victim told him the abuse occurred for four years." *Grammer*, 2011 WL 2184960, at *14

The TCCA, citing to Rule 24(a), of the Tennessee Rules of Appellate Procedure, which "places the initial responsibility for selecting the contents of the appellate record on the appellant (there, petitioner), noted the absence from the record of the jury-out hearing. The intermediate state court then found the trial testimony of Officer Haley, (i.e., that the victim related to him the abuse "had been going on for a number of years") was not inconsistent with the victim's testimony that the abuse occurred for two years. After determining the victim was extensively cross-examined concerning her mental state; her online dairy, which was devoid of any allegations of sexual abuse; and her motives for claiming the petitioner abused her, the TCCA concluded he had failed to show he received ineffective assistance of counsel and declined to grant him any relief.

Cross-examination is the "principal means by which the believability of a witness and the truth of [her] testimony are tested," *Davis v. Alaska*, 415 U.S. 308, 316 (1974), and "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986). Though a failure properly to cross-examine a witness could form the basis for a finding of ineffective

assistance, *Jackson v. Houk*, 687 F.3d 723, 742-43 (6th Cir. 2012), typically, a decision as to "whether to engage in cross-examination, and if so to what extent and in what manner, [is] . . . strategic in nature." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.1987).

Given the presumption that counsel's challenged conduct must be considered sound trial strategy, as well as the difficulty encountered by a petitioner in challenging counsel's tactical decisions, the Court finds the state court could reasonably have found counsel's cross-examination of this witness to have fallen "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

But even if counsel's performance in this regard was somehow subpar, petitioner has not shown he sustained prejudice thereby. "A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001); *see also Harrington*,131 S.Ct. at 792 ("The likelihood of a different result must be substantial, not just conceivable."). Absent some showing of prejudice, the TCCA's rejection of Grammer's argument that this claimed attorney error of judgment violated his right to receive reasonably effective assistance of counsel was not an unreasonable application of *Strickland*.

### c. *"Fresh Complaint" Testimony*

While the memorandum contains the bald, factually unadorned allegation that counsel failed to object to inadmissible "fresh complaint" testimony, this assertion is fleshed out in petitioner's reply, wherein he explains his attorneys failed to challenge the admission of hearsay testimony by the victim's mother; Officer Haley, the officer who responded to the mother's 911 call to report the sexual abuse of her daughter; and Kathy Spada, the nurse practitioner who examined the victim.

27

This ineffective assistance claim was offered to the TCCA based on a failure to object to a violation of state evidentiary law. The state appellate court determined the admission of the mother's and officer's testimony did not violate Tennessee's evidentiary rules, citing specifically to Rule 801-802 of the Tennessee Rules of Evidence and to cases interpreting the "fresh complaint" doctrine,[3] and that it comported in all respects with state law. *Grammer*, 2011 WL 2184960, at *12.

The nurse practitioner's testimony was found admissible under Rule 803(4) of the Tennessee Rules of Evidence, as the victim's statements to the nurse were considered to have been made for the purpose of medical diagnosis and treatment. The nurse's recounting of the victim's statement that Grammer scared her, if not admissible under Rule 803(4), would have been, at most, harmless error. Finding the witnesses' testimony admissible and not violative of any state evidentiary rules, the TCCA concluded counsel did not render a deficient performance by failing to object to the testimony.

The root of this ineffective assistance claim was an alleged violation of state evidentiary rules, which the TCCA found had not been violated in the first place. "State courts are the final arbiters of their own state law." *Danforth v. Minnesota*, 552 U.S. 264, 291-92 (2008); *Douglas v. City of Jeannette (Pennsylvania)*, 319 U.S. 157, 163-64 (1943) (As to "state law, the state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted.").

Failure to object to testimony which is admissible and does not violate an applicable rule of evidence, does not fall outside "the wide range of professionally competent assistance" which the

---

[3]    The "fresh complaint" doctrine permits the prosecution, in its case-in-chief, to introduce evidence of the fact of a victim's complaint of a sexual offense, except when a child under thirteen is the victim. Grammer, 2011 WL 2184960, at *12.

Sixth Amendment requires. *Strickland*, 466 U.S. at 690. Furthermore, even if counsel's performance was constitutionally lacking, no prejudice ensues from an attorney's failure to raise a meritless claim. *See Greer v. Mitchell*, 264 F.3d 663, 676 (2001); *Krist v. Foltz*, 804 F.2d 944, 946-47 (6th Cir.1986). Therefore, the state court's resolution of the ineffective-assistance claim was neither contrary to or an unreasonable application of *Strickland*. This claim provides no basis for habeas corpus relief.

## IV.   PENDING MOTIONS

Grammer has filed motions for production of documents and for a hearing and to appoint counsel, (Court File Nos. 9-10). Given the above discussion, which finds petitioner is not entitled to habeas corpus relief, and given the order of judgment to follow, based on the Court's finding, these motions will be DENIED as MOOT.

## V.   CERTIFICATE OF APPEALABILITY

Finally, the Court must decide whether to issue a certificate of appealability (COA). Grammer qualifies for issuance of a COA if he has made a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c). A petitioner, whose claims have been rejected on the merits, satisfies the requirements of § 2253(c) by showing jurists of reason would find the assessment of the claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). A petitioner, whose claims have been rejected on a procedural basis, must demonstrate reasonable jurists would debate the correctness of the Court's procedural ruling. *Id.*; *Porterfield v. Bell*, 258 F.3d 484, 485-86 (6th Cir. 2001).

The Court has individually assessed petitioner's claims under the relevant standards and finds those claims do not deserve to proceed further because they have no viability in light of the governing law. Thus, jurists of reason would not conclude the disposition of those claims was debatable or

29

wrong.  Because petitioner has failed to make a substantial showing of the denial of a constitutional

right, a COA will not issue.

**A separate order will follow.**

**ENTER:**

**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**